## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |
|---|---|
| Kimberly Davis and Vanessa Romano, individually and as representatives of a class of similarly situated persons,<br><br>       Plaintiffs,<br><br>   v.<br><br>Stadion Money Management, LLC, and United of Omaha Life Insurance Company,<br><br>       Defendants. | Case No. 8:19-cv-00556-JFB-CRZ |

## DEFENDANT UNITED OF OMAHA LIFE INSURANCE COMPANY'S
## ANSWER AND DEFENSES TO PLAINTIFFS'
## SECOND AMENDED CLASS ACTION COMPLAINT

Defendant United of Omaha Life Insurance Company ("United"), by and through its

undersigned counsel and pursuant to Federal Rule of Civil Procedure 8, hereby submits the

following Answer and Defenses to the Second Amended Complaint Class Action Complaint

("SAC") of Plaintiffs Kimberly Davis and Vanessa Romano ("Plaintiffs").

### GENERAL DENIAL

United denies each and every allegation of the SAC not specifically admitted.

### ANSWERS TO PLAINTIFFS' SPECIFIC ALLEGATIONS:

Subject to its Affirmative Defenses, United pleads as follows to the specific allegations

contained in the numbered paragraphs of Plaintiffs' SAC.[1]

### NATURE OF THE ACTION

---

[1] The SAC contains several headings and/or subheadings.  United does not consider these to be
substantive allegations to which a response is required.  However, to the extent that a responsive
pleading is required, United denies any and all allegations within any such heading or
subheading.

1.      Plaintiffs Kimberly Davis and Vanessa Romano ("Plaintiffs"), individually and as representatives of the Class described herein, bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. ("ERISA"), against Defendants Stadion Money Management, LLC ("Stadion") and United of Omaha Life Insurance Company ("United of Omaha"). As described herein, Defendants have breached their fiduciary duties and engaged in other unlawful conduct to the detriment of Plaintiffs and the Class. Plaintiffs bring this action to recover losses caused by this unlawful conduct, prevent further similar conduct, and obtain equitable and other relief as provided by ERISA.

**Answer:**  United admits that Plaintiffs purport to bring this action against Stadion Money Management, LLC ("Stadion") and United on behalf of themselves and a class of individuals under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.  United denies the remaining allegations in Paragraph 1, and specifically denies that United violated any provisions of ERISA or any other law; denies that Plaintiffs or any putative class member are entitled to relief under ERISA or any law; and denies that class action treatment is appropriate.

## PRELIMINARY STATEMENT

2.      Stadion provides a managed account service to participants in employer sponsored retirement plans governed by ERISA. Through the service, participants pay Stadion a fee, and in return, Stadion accepts complete fiduciary discretion to manage the participant's retirement account by allocating the participant's account balance among the investment options offered within the plan.

**Answer:**  Upon information and belief, United admits that Stadion provides a managed account product and earns compensation for such product.  United denies the remaining allegations in Paragraph 2.

3.      Stadion is not a well-known investment manager. Although Stadion has over $3 billion in assets under management within its managed account service, this is based not on the strength of its investment management acumen, but on its relationships with insurance companies who market group annuity products to small and midsize retirement plans. This case focuses on Stadion's relationship with United of Omaha, and the self-interested conduct of both parties in relation to Class members' retirement assets.

**Answer:**  United admits it has a business relationship with Stadion.  United lacks information or knowledge sufficient to form a belief as to the truth of the allegation that "Stadion is not a well-known investment manager" or the amount of assets under management by Stadion within its managed account service and therefore denies those allegations.  United denies the remaining allegations in Paragraph 3.

4.      Stadion depends on United of Omaha as its entrée to employers. United of Omaha sells employers a group annuity product that serves as a one-stop-shop for employees' retirement savings. United of Omaha also pitches Stadion's managed accounts as an add-on service. If employers include Stadion's service, Stadion exercises complete discretion over participating employees' accounts by selecting investments from the menu of options in the employer's retirement plan.

**Answer:**  United admits that it offers to retirement plan sponsors group annuity products. United further admits that it also makes available to retirement plan sponsors that select United's product and services the option to offer their plan participants managed account products provided by Stadion and other providers.  United denies the remaining allegations in Paragraph 4.

5.      It is not unusual for a managed account provider to depend on another provider to pitch its service to employers. There is potential for abuse, however, if a managed account provider can reward its marketing partner (and ultimately itself) by selecting investment options that generate higher fees for its partner firm (and, in turn, more referrals for itself). Unfortunately, that is what happened here, and Defendants violated ERISA by putting their own interests ahead of retirement plan participants.

**Answer:**  United admits that business relationships between insurance companies and managed account providers are not unusual.  United denies the remaining allegations in Paragraph 5.

6.      Stadion owed fiduciary duties under ERISA to every participant enrolled in its service. These duties are "the highest known to the law." *Tatum v. RJR Pension Inv. Cmmtee*, 761 F.3d 346, 358 (4th Cir. 2014). Stadion was required to act solely in the interest of participants and beneficiaries, and "exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000). Stadion also was

required to manage participants' accounts with the care, skill, prudence, and diligence of a prudent person in similar circumstances. 29 U.S.C. § 1104(a)(1)(B). For its part, United of Omaha could not knowingly benefit from Stadion's violations of ERISA in connection with the managed account program. *See Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

**Answer:**  Paragraph 6 asserts legal conclusions to which no response is required.  To the

extent a response is required, United admits that Paragraph 6 purports to characterize and

partially quote language in statutory and case authority.  United denies the remaining allegations

in Paragraph 6.

7.       Stadion breached its fiduciary duties by making investment decisions to further its own interests and the interests of United of Omaha. Stadion directed participants' accounts into United of Omaha- and Stadion-affiliated investment options, despite the availability of lower-cost, higher-performing investment options within the plan that would have better met the needs of participants. In certain cases, there were identical options available in the plan menu that would have charged 50% less in fees. Stadion avoided these options because they did not generate as much revenue for its business partner, United of Omaha. In other cases, Stadion financially benefited itself and United of Omaha by continuing to use Stadion-affiliated accounts despite their underperformance on both an absolute and risk-adjusted basis.

**Answer:**  The first sentence in Paragraph 7 asserts a legal conclusion to which no

response is required.  To the extent a response is required, United denies the allegation.  United

denies the remaining allegations in Paragraph 7.

8.       United of Omaha improperly retained revenue resulting from Stadion's malfeasance despite knowledge of Stadion's compromised loyalty and imprudence. Indeed, United of Omaha expected preferential treatment from Stadion in exchange for retaining Stadion as a managed account provider available through its retirement platform.

**Answer:**  United denies the allegations in Paragraph 8.

9.       Based on this conduct, Defendants cost participants millions of dollars in losses due to excess fees and investment underperformance. To remedy this, Plaintiffs assert ERISA claims against Stadion for breach of the fiduciary duties of loyalty and prudence (Count I) and prohibited transactions (Counts III & IV), and against United of Omaha for knowingly profiting from ERISA violations (Count II).

4

**Answer:** United admits that Plaintiffs purport to bring claims under ERISA but denies that United violated any provisions of ERISA or any other law and that Plaintiffs are entitled to any remedy. United denies the remaining allegations in Paragraph 9.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide, among other things, that participants in an employer-sponsored retirement plan may pursue a civil action to redress violations of ERISA, recover losses resulting from a fiduciary breach, restore profits made by fiduciary self-dealing, and obtain appropriate equitable relief, as set forth in 29 U.S.C. §§ 1109 and 1132.

**Answer:** United admits that Plaintiffs purport to bring their claims under 29 U.S.C. § 1132(a)(2) and (3), but denies that Plaintiffs are entitled to relief under these provisions, other ERISA provisions, or any other law. United denies the remaining allegations in Paragraph 10.

11.     This case presents a federal questions under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

**Answer:** Paragraph 11 asserts legal conclusions to which no response is required. To the extent a response is required, United admits that the District of Nebraska has subject matter jurisdiction.

12.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because Plaintiff Vanessa Romano resided in this district when she received Stadion's managed account services through her employer's retirement plan, and Defendant United is located in this District.

**Answer:** Paragraph 12 asserts legal conclusions to which no response is required. To the extent a response is required, United admits that venue is proper in the District of Nebraska.

## THE PARTIES

### PLAINTIFFS

13.     Plaintiff Kimberly Davis has resided in Greensboro, North Carolina since 2008. Plaintiff worked for Palace Entertainment in Greensboro, North Carolina and Riverhead, New York, and participated in its 401(k) retirement plan (the "Palace Plan"). The Palace Plan offered

investments through a United of Omaha group variable annuity contract, and also included
Stadion's managed account service. Plaintiff Davis was a participant in Stadion's managed
account service until March 2013, at which time Davis received a distribution of the benefits in
her account from the Palace Plan, and Stadion canceled her service. Plaintiff Davis's account
would have been worth more at the time it was distributed if not for Defendants' violations of
ERISA.

**Answer:**  Upon information and belief, United admits that Plaintiff Davis resides or

resided in North Carolina, formerly worked for Festival Fun Parks, LLC ("Festival"), formerly

participated in the Palace Entertainment 401(k) Plan (the "Palace Plan"), and formerly

participated in Stadion's managed account product while participating in the Palace Plan.  United

further admits the third sentence of Paragraph 13.  United denies the remaining allegations in

Paragraph 13.

14.     Plaintiff Vanessa Romano has resided in Omaha, Nebraska since 1987. Plaintiff
Romano worked for American Title, Inc. in Omaha, Nebraska and participated in its 401(k)
retirement plan (the "American Title, Inc. 401k Plan"). The American Title, Inc. 401k Plan
offered investments through a United of Omaha group variable annuity contract, and also
included Stadion's managed account service. Plaintiff Romano was a participant in Stadion's
managed account service until March 2018, at which time Romano rolled her monies into a
different 401(k) retirement plan. Plaintiff Romano's account would have been worth more at the
time it was distributed if not for Defendants' violations of ERISA.

**Answer:**  Upon information and belief, United admits that Plaintiff Romano resides or

resided in Nebraska, worked for American Title, Inc., formerly participated in the American

Title, Inc. 401k Plan (the "American Title Plan"), and formerly participated in Stadion's

managed account product while participating in the American Title Plan.  United admits the third

sentence of Paragraph 14.  United denies the remaining allegations in Paragraph 14.

## DEFENDANTS

15.     Stadion is a registered investment adviser based in Watkinsville, Georgia. Stadion
started business in 1993 as Personal Mutual Fund Management Inc., and has also operated under
service marks "401k Toolbox" and "Manage it for Me". Stadion provides its managed account
services to participants in ERISA-covered plans throughout the United States, including North
Carolina.

**Answer:** United admits that Stadion is a registered investment adviser based in Georgia and provides managed account products to participants in retirement plans in the United States, including North Carolina. United denies the remaining allegations in Paragraph 15.

16.     United of Omaha is an insurance company first organized in Nebraska in 1926 and based in Omaha, Nebraska. United of Omaha issues group variable annuity contracts to employer-sponsored retirement plans and provides attendant administrative and investment services. United of Omaha services numerous retirement plans in North Carolina, and manages investments of numerous participants located in North Carolina.

**Answer:** United admits that it is an insurance company incorporated under the laws of the State of Nebraska, it maintains its principal place of business in Omaha, Nebraska, and its predecessor company was incorporated in 1926. United further admits that it offers group annuity products to retirement plan sponsors and provides related administrative services. United also admits that some of its customers sponsor retirement plans with participants who reside in North Carolina. United denies the remaining allegations in Paragraph 16.

## BACKGROUND

### SMALL RETIREMENT PLAN MARKETPLACE AND MANAGED ACCOUNT SERVICES

17.     United of Omaha serves the "small" retirement plan market. Most plans that include Stadion's managed account service through United of Omaha have fewer than 100 participants with account balances.

**Answer:** United admits that some of its customers that have elected to use Stadion's managed account product sponsor retirement plans with fewer than 100 participants. United denies the remaining allegations in Paragraph 17.

18.     Insurance companies like United of Omaha have the largest share of the market for services to small plans. Insurance companies and their agents typically market group variable annuity contracts to small plans, with an array (typically 15-60) of annuity "subaccounts" (see *infra*, ¶ 29) as investment options for participants.

**Answer:**  United admits that it offers group annuity contracts to retirement plan sponsors and some of those group annuity contracts provide investment options through a structure called Separate Account K, which is comprised of subaccounts holding the assets invested in each option available on United's platform.  United denies the remaining allegations in Paragraph 18.

19.     Insurance companies sell group variable annuities as a comprehensive solution to a smaller company's retirement plan needs. In addition to the underlying investments, these products often include services such as recordkeeping, custodial services, annual reporting, discrimination testing, preparation of required performance and fee disclosures, employee enrollment and education, and a secure website for employee account management.

**Answer:**  United admits that certain insurance companies offer group annuity contracts with different terms and features and may also offer administrative services in connection with those group annuity contracts.  United denies the remaining allegations in Paragraph 19.

20.     In light of the comprehensive nature of these products, employers sponsoring small retirement plans typically do not independently investigate additional services to supplement those provided by the insurance company. As a result, companies wishing to deliver additional services to the small retirement plan market typically must do so through a marketing agreement with one or more of the providers servicing this market.

**Answer:**  United lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 20 and therefore denies those allegations.

21.     This has indeed been the case with managed account services. In basic form, a managed account provider operates as a "3(38)" fiduciary under ERISA. The managed account provider has complete discretion to manage and dispose of the assets in the participant's account by selecting which of the plan's options to invest in, the amount of existing assets to invest in each option, and the investments to which future contributions are directed.

**Answer:**  The second and third sentences in Paragraph 21 assert legal conclusions to which no response is required.  To the extent a response is required, United denies those allegations.  United denies the remaining allegations in Paragraph 21.

22.     Industry executives have acknowledged that a small plan's choice of a managed account provider is "driven" by existing service providers. *See Advisory Council Report of the Working Group on Optional Professional Management in Defined Contribution Plans* (Nov. 7,

2003), available at https://www.dol.gov/agencies/ebsa/aboutebsa/about-us/erisa-advisory-council/2003-optional-professional-management-indefined-contribution-plans (last visited January 24, 2019). Based on this and other research, a Department of Labor advisory group found that small plans have "limited ability … to independently assess and monitor the qualifications and performance" of managed account providers. *See id*. The influence a small plan's primary service provider has in the selection and retention of a managed account provider creates risk of confused loyalties for the managed account provider. A managed account provider must act solely in the interest of participants, see *supra*, ¶ 6, but its marketing partners control whether its services will be offered.

    **Answer:**  Paragraph 22 purports to characterize and/or quote a document published over

16 years ago and (by reference to Paragraph 6) a statute and case law, which speak for

themselves; therefore no response is required.  To the extent a response is required, United

denies those allegations.  United denies the remaining allegations in Paragraph 22.

## STADION'S MANAGED ACCOUNT SERVICE

    23.    During its first ten years, Stadion accumulated approximately $445 million in assets under management. Over its next ten years, by 2013, Stadion grew to over $5 billion. The primary source of Stadion's accelerated growth was its managed account service for small retirement plans.

    **Answer:**  United lacks information or knowledge sufficient to form a belief as to the

truth of the allegations in Paragraph 23 and therefore denies those allegations.

    24.    Stadion's managed account service did not grow as a result of its strong brand name or performance record. Indeed, during this period of rapid growth, Stadion changed its name, canceled its longtime service marks, and delivered underwhelming results. Independent third-party plan consultants have almost universally rejected Stadion-managed investments for their clients.

    **Answer:**  United lacks information or knowledge sufficient to form a belief as to the

truth of the allegations in Paragraph 2, and therefore denies those allegations.

    25.    Instead, like other managed account providers in the small plan market, see *supra*, ¶ 21, Stadion depended on its relationships with other service providers. Stadion established new marking relationships with insurance companies and their affiliates to pitch Stadion's managed account service in connection with their group variable annuity platforms. One of those insurance companies was United of Omaha.

**Answer:**  United admits that it has a business relationship with Stadion.  United lacks

information or knowledge sufficient to form a belief as to the truth of the remaining allegations

in Paragraph 25 and therefore denies those allegations.

26.     Stadion receives a managed account fee for its service. Stadion splits its managed
account fee with insurance companies and their affiliates, including United of Omaha and its
affiliates. This fee is incurred by plan participants, and is paid on top of the fees that are charged
within the underlying investment options.

**Answer:**  United admits that retirement plan participants utilizing Stadion's managed

account service pay a fee for such service.  United further admits that plan participants utilizing

Stadion's managed account service pay a percentage of assets invested for the managed account

service, of which Stadion allocates a percentage to United for its administrative services.  United

lacks information or knowledge sufficient to form a belief as to the truth of the remaining

allegations in sentence two of Paragraph 26 and therefore denies those allegations.  United

further admits that participants in the Palace Plan who utilized Stadion's services paid a fee for

those services that was separate from the expense ratio associated with the underlying Stadion

portfolio in which the participant invested.  United denies the remaining allegations in Paragraph

26.

27.     Once Stadion's services commence, Stadion has complete discretion over
participating employees' accounts. Stadion determines which of the plan's investment options to
invest in, the amount of existing assets to invest in each option, and the investments to which
future contributions are directed. This presents a potential conflict of interest where the
investments being selected are offered by Stadion or its marketing partner.

**Answer:**  United denies the allegations in Paragraph 27.

28.     Stadion allows employers to offer its service to employees on an opt-in or opt-out
basis. This choice does not affect Stadion's investment strategy or the claims asserted herein.
Stadion manages a participant's account the same way, regardless of whether an account is an
opt-in or opt-out account.

10

**Answer:**  United admits that plan sponsors may elect to offer Stadion's advisory services and portfolios to plan participants on an opt-in or opt-out basis.  Footnote 1 in Paragraph 28 asserts legal conclusions and purports to characterize and quote written documents and a regulation, which speak for themselves; therefore no response is required.  To the extent a response is required, United denies those allegations.  United lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28 and therefore denies those allegations.[2]

## UNITED OF OMAHA'S GROUP VARIABLE ANNUITY INVESTMENT OPTIONS

29.    United of Omaha maintains a list of investment options available through its group variable annuity contracts. These investment options are called "subaccounts". Generally, each subaccount is a pooled investment vehicle managed at the direction of an investment manager. A subaccount's investment strategy may call for investment in a particular asset class (e.g., stocks, bonds), sub-asset class (e.g., small cap stocks, large cap stocks), style (e.g., growth, value), or a mix of asset classes and styles. Further, the subaccount manager can execute this strategy either by investing directly in stocks and bonds, or by investing in other pooled investment vehicles—such as mutual funds, collective investment trusts, or exchange-traded funds—that themselves purchase securities in order to execute a particular investment strategy.

**Answer:**  United admits that it offers group annuity contracts to employers that sponsor 401(k) retirement plans.  United further admits that the group annuity contracts provide access to the Guaranteed Account and other investment options made available through a structure called Separate Account K, which is comprised of subaccounts holding the assets invested in each option available on United's platform.  United also admits that the subaccounts include a range of underlying investments, including mutual funds, collective/commingled funds, and managed accounts.  United further admits that it contracts with investment managers to manage the

---

[2] Paragraph 29 contains a footnote.  United has responded to this footnote as part of the Answer to Paragraph 29.  United has likewise responded to the other footnotes in the SAC as part of the Answers to the corresponding Paragraph for each footnote.

underlying funds and portfolios offered through Separate Account K.  United denies the

remaining allegations in Paragraph 29.

30.     Each subaccount (other than the Guaranteed Account, see *infra*, ¶ 32) charges fees
as a percentage of the net asset value of the subaccount. This is called the "expense ratio". The
expense ratio reduces the investment return received by participants. The expense ratio is
separate from, and in addition to, the managed account fee.

**Answer:**  United admits that the investment options available in connection with a

United group annuity contract, except the Guaranteed Account, had a fee called the expense

ratio, which was expressed as a percentage of assets under management.  United further admits

that plan participants paid the expense ratios charged by the investments in which they were

invested, and that the expense ratio was deducted from the individual participant's account's

assets.  United further admits that participants in the Palace Plan who utilized Stadion's services

paid a fee for those services that was separate from the expense ratio associated with the

underlying Stadion portfolio.  United denies the remaining allegations in Paragraph 30.

31.     Each subaccount's expense ratio has two parts, the management fee and the
product charge. The management fee includes the investment manager's fee and any fees
charged by underlying investments selected by the investment manager. The product charge is
paid to United of Omaha for administrative services in connection with the subaccount. Expense
ratios (including each part, the management fee and the product charge) may vary between
subaccounts, but not between plans. On a periodic basis, at least quarterly, product charges are
deducted from the pooled assets of each investment option and paid to United of Omaha. The
amount of each periodic distribution to United of Omaha is a percentage of the amount of assets
invested in the option, and thus any additional investment in a particular option will increase the
amount of the product charge that United of Omaha receives.

**Answer:**  United admits that when it provides administrative services to a retirement plan

in connection with a group annuity contract, the cost for such administrative services is covered

through a product charge applied to each Separate Account K subaccount.  United further admits

that the product charge is included in the expense ratios paid by plan participants.  United also

admits that the expense ratio covers other fees, including the fee paid to the investment manager.

United further admits that retirement plan participants utilizing Stadion's managed account service pay a fee for that service and that Stadion allocates a portion of that fee to United for its administrative services.  United denies the remaining allegations in Paragraph 31.

32.     The Guaranteed Account is a special interest-bearing subaccount managed by United of Omaha. There is no explicit expense ratio for this subaccount. Instead, United of Omaha retains investment earnings that exceed the interest credited to participants. United of Omaha refers to its retained earnings as "implicit fees". These fees are separate from, and in addition to, the managed account fee. United of Omaha earns regular interest on the underlying portfolio of fixed income securities, then credits interest to participant accounts on a monthly basis in an amount that is less than the amount of interest it is taken in, and thus is paid the "implicit fees" associated with the Guaranteed Account in a series of transactions that generally take place on a monthly basis. Because both the interest that United of Omaha receives and the amount it pays out—and thus also the spread between those two figures—varies based on the amount of assets invested in the Guaranteed Account, every additional investment made in the Guaranteed Account increases the amount of the "implied fees" that United of Omaha earns each month.

**Answer:**  United admits that the Guaranteed Account is an investment product offered by United in connection with group annuity contracts.  United also admits that the Guaranteed Account is a capital-preservation investment option that guarantees each investor's principal and credits interest on a monthly basis.  United further admits that it bears the investment risk and retains (or pays) the difference between the credited rate and the return it earns (or loses) on the funds invested in the Guaranteed Account.  United denies the remaining allegations in Paragraph 32.

33.     There are several subaccounts that are available in every United of Omaha-administered plan that includes Stadion's managed account service. The first category is index funds that track a market index associated with a particular asset class. Each such plan offers a large cap, mid cap, small cap, international, and bond index fund subaccount. The second type of subaccount is the Guaranteed Account. The third and final category is a set of asset allocation subaccounts for which Stadion serves as the investment manager.

**Answer:**  United admits that annuity contracts with a Separate Account K structure make available dozens of subaccounts, including mutual funds, collective/commingled funds, and

managed accounts that have different and varied investment objectives.  United also admits that

retirement plan sponsors who select Stadion's managed account service include Stadion's

managed portfolios in their investment lineups.  United further admits that employers that elect

Stadion's managed account services in connection with a group annuity contract from United

must include the Guaranteed Account as an investment option under the plan.  United denies the

remaining allegations in Paragraph 33.

### STADION'S APPROACH TO MANAGED ACCOUNTS IN UNITED OF OMAHA PLANS

34.     Stadion manages thousands of participant accounts in United of Omaha-administered plans through its managed account program. On behalf of each participant, Stadion has complete discretion to select between available subaccounts, to decide how much of their account will be invested in each subaccount, and to change between subaccounts.

**Answer:**  United admits that retirement plan participants participate in Stadion's

managed account service through retirement plans for which United provides group annuity

contracts and related administrative services.  United denies the remaining allegations in

Paragraph 34.

35.     Stadion does not create a custom portfolio for each individual participant. Instead, each participant is assigned to one of six risk-based portfolios: Capital Preservation, Conservative, Balanced, Moderate Growth, Growth, and Maximum Growth. Risk assignments may be based on a participant's age or responses to a questionnaire. Stadion invests each portfolio the same way for all participants assigned to that portfolio.

**Answer:**  United admits that Stadion's managed account service invests participants'

funds among risk-based portfolios at times referred to as Max Growth, Growth, Moderate

Growth, Balanced, Conservative, and Capital Preservation.  United further admits that these

portfolios are designed to achieve age-based risk objectives for plan participants based on their

ages or risk profiles, based in part on information provided by participants.  United denies the

remaining allegations of Paragraph 35.

14

36.    Stadion uses a core/flex approach to manage each portfolio. Part of each portfolio remains invested in equity securities at all times, and part of each portfolio remains invested in fixed income securities at all times. This is the core part, and Stadion puts money in several different subaccounts, including its own, to execute the core portion of the strategy. The remainder of each portfolio is devoted to Stadion's asset allocation strategy. This is the flex part. Stadion adjusts the asset allocation of the flex portion based on its assessment of market conditions. Stadion exclusively used its own subaccounts to execute the flex portion of each portfolio. The proportion of each portfolio allocated to core equity or core fixed income, or reserved for flex, is based on the risk objective of the portfolio, as illustrated by the chart below:

**Answer:**  United admits that each portfolio in Stadion's managed account service allocates a fixed percentage of a participant's assets into "core equity" and "core fixed income" portfolios.  United further admits that the remaining assets are reserved for "flex" investing to permit Stadion to invest based on market conditions and events.  United also admits that the Stadion portfolios invest primarily in exchange-traded funds and cash positions.  United denies the remaining allegations of Paragraph 36.

## DEFENDANTS' VIOLATIONS OF ERISA

### STADION'S SELECTION AND RETENTION OF COSTLY, UNDERPERFORMING INVESTMENTS TO BENEFIT ITSELF AND UNITED OF OMAHA

37.    In selecting subaccounts to implement each portfolio's investment strategy, Stadion was acting in a fiduciary capacity.  Stadion was bound by the twin fiduciary duties of loyalty and prudence outlined in 29 U.S.C. § 1104(a).  These duties are "the highest known to the law." *Tatum*, 761 F.3d 346, 358 (4th Cir. 2014).

**Answer:**  Paragraph 37 asserts legal conclusions and purports to characterize a statute and quote a statute and case law, which speak for themselves; therefore no response is required. To the extent a response is required, United denies the allegations in Paragraph 37.

38.    "Perhaps the most fundamental duty of a fundamental duty of a [fiduciary] is that he [or she] must display … complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).

**Answer:** Paragraph 38 purports to quote case law, which speaks for itself; therefore no response is required. To the extent a response is required, United admits that Paragraph 38 quotes phrases found in the cited opinion but otherwise denies the allegations in Paragraph 38.

39.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (citation and internal quotation marks omitted). Under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (citation and internal quotation marks omitted).

**Answer:** Paragraph 39 purports to quote case law, which speaks for itself; therefore no response is required. To the extent a response is required, United admits that Paragraph 39 quotes phrases found in the cited opinions but otherwise denies the allegations in Paragraph 39.

40.     Fiduciaries may be held liable for assembling an imprudent investment portfolio or for failing to monitor those investments to ensure that each option remains prudent. *See Tatum*, 761 F.3d at 358; *Sims v. BB&T Corp.*, 2018 WL 3128996, at *5, 7–8 (M.D.N.C. June 26, 2018).

**Answer:** Paragraph 40 purports to characterize case law, which speaks for itself; therefore no response is required. To the extent a response is required, United denies the allegations in Paragraph 40.

41.     "Congress intended ERISA's fiduciary responsibility provisions codify the common law of trusts." *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001). Pursuant to trust law's prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also id.* § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function . . . ."). The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market-efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of

> modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled-investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

*Id.*, ch. 17, intro. note (2007). ERISA's requirement that fiduciaries "defray[] reasonable expenses of administering the plan" embraces this common law duty to limit costs. 29 U.S.C. § 1104(a)(1)(A)(ii).

**Answer:** Paragraph 41 purports to characterize case law, a legal treatise, and a statute, which speak for themselves; therefore no response is required. To the extent a response is required, United admits that Paragraph 41 quotes phrases and sentences from the cited sources but otherwise denies the allegations in Paragraph 41.

42. Stadion breached its fiduciary duties and violated other provisions of ERISA (see *infra*, Counts I, III & IV) in several respects.

**Answer:** United denies the allegations in Paragraph 42.

### Stadion's Investment of the Core Equity Portion of Managed Accounts

43. As illustrated above (see *supra*, ¶ 36), Stadion's approach to managed accounts calls for between 5% and 65% of each participant's account to remain invested in a core equity position (i.e., stocks).

**Answer:** On information and belief, United admits that each Stadion portfolio allocates a percentage of assets to equity exposure. United denies the remaining allegations in Paragraph 43.

44. To accomplish this, Stadion has allocated the core equity portion of each participant's portfolio to the Stadion-managed asset allocation subaccounts available in each plan. Through these subaccounts, Stadion has purchased and retained exchange-traded funds that track major stock market indexes.

**Answer:** United admits that the Stadion managed account service invests in Stadion-managed portfolios. On information and belief, United further admits that the Stadion portfolios in which plan participants invested, including the "core equity" portfolio, were invested primarily in exchange-traded funds. United denies the remaining allegations of Paragraph 44.

45. Stadion's use of its own subaccounts to invest the core equity portion of each managed account added extra costs for participants. The extra fees were paid to United of Omaha, but conferred no benefit on participants. Stadion could have instead allocated the core equity portion of participants' accounts into the index fund subaccounts available in each plan, which would have provided access to the exact same underlying securities at significantly lower cost to participants. But Stadion either did not investigate the cost differences between subaccounts, or chose the higher cost strategy to benefit its marketing partner, United of Omaha.

**Answer:** United denies the allegations in Paragraph 45.

46. To illustrate, approximately half of the core equity assets held in Stadion subaccounts are invested in S&P 500 index funds. S&P 500 index funds seeks to replicate the performance of the Standard & Poor's 500 Index by investing in the underlying equity securities that make up that index.

**Answer:** United lacks information or knowledge sufficient to form a belief as to the truth of the allegation in the first sentence of Paragraph 46 and therefore denies that allegation. United admits that certain index funds are designed to track the performance of the Standard & Poor's 500 Index. United denies the remaining allegations in Paragraph 46.

47. Assets invested in this manner are subject to the product charge for Stadion-managed subaccounts (paid to United of Omaha, see *supra*, ¶ 31) and an underlying fund charge (paid to the manager of the underlying S&P 500 fund, see *id*.). Yet Stadion could have invested in the same underlying securities by investing directly in the plan's S&P 500 index fund subaccount that was available in every one of the United of Omaha plans at issue. *See supra*, ¶ 33. The underlying fund charge in this subaccount was materially similar to the underlying fund charge in the Stadion-managed subaccounts, but the product charge paid to United of Omaha was about 50% less (United of Omaha charges higher product charges in Stadion-affiliated subaccounts than any other subaccount within these plans).

**Answer:** United admits that plan participants pay an "expense ratio" equal to a percentage of their holdings invested in Stadion-managed portfolios. United further admits that

the expense ratio covers the costs for the investment management of the underlying portfolio and

the product charge for United's administrative services.  United denies the remaining allegations

in Paragraph 47.

48.     Participants would have earned approximately 0.30% higher net returns on S&P 500 investments in the core equity portion of their portfolios if Stadion had used the S&P 500 index fund subaccount instead of the Stadion-managed asset allocation subaccounts. Put another way, United of Omaha received approximately 0.30% more from S&P 500 investments in the core equity portion of participant accounts as a result of Stadion's choice of subaccounts, all at the expense of participants.

**Answer:**  United denies the allegations in Paragraph 48.

49.     Stadion also benefits from allocating monies to the Stadion-affiliated subaccounts. These allocations boost Stadion's reportable assets under management, improving its attractiveness within the marketplace. The higher level of Stadion's core equity investments allowed it to enter into a joint marketing venture with the investment manager of the exchange-traded funds that Stadion used to invest the core equity assets in its subaccount. And the higher assets under management lowered Stadion's trading costs, benefiting Stadion's other customers and thus Stadion's standing in the marketplace.

**Answer:**  United lacks information or knowledge sufficient to form a belief as to the

truth of the allegations in Paragraph 49 and therefore denies the allegations.

50.     The same imprudent conduct described above relating to the S&P 500 index fund investment occurred for core equity investments other than the S&P 500. Stadion invested in other stock market indexes through Stadion-managed asset allocation subaccounts, despite having access to other index fund subaccounts that invested in the same underlying securities at lower cost to participants (i.e., with a lower product charge paid to United of Omaha).

**Answer:**  United denies the allegations in Paragraph 50.

51.     The costlier route afforded no advantage to participants. The only difference was that index funds used in Stadion-managed subaccounts are exchanged-traded funds, which are valued and trade intraday, whereas the index funds used in other subaccounts are valued once per day and may only be bought and sold as of market close. Although intraday trading could be beneficial within the flex portion of Stadion's managed accounts, this possible benefit does not apply to the core equity portion. Stadion's core equity strategy is a buy-and-hold strategy, so being able to move rapidly in and out of markets based on intraday valuations was not a benefit. A prudent and loyal fiduciary implementing the core equity strategy would have used the lower-cost index fund subaccounts and would have avoided the higher product charges that resulted from investing in index funds through Stadion's asset allocation subaccounts.

**Answer:**  On information and belief, United admits that the Stadion portfolios invest primarily in exchange-traded funds and cash positions.  United further admits that exchange-traded funds are valued and traded intraday and mutual funds are not.  United denies the remaining allegations in Paragraph 51.

### *Stadion's Investment of the Core Fixed Income Portion of Managed Accounts*

52.     As illustrated above (see *supra*, ¶ 36), Stadion's approach to managed accounts calls for between 10% and 55% percent of each participant's account to remain invested in a core fixed income position.

**Answer:**  On information and belief, United admits that each Stadion portfolio allocates a percentage of assets to fixed income exposure.  United denies the remaining allegations in Paragraph 52.

53.     To accomplish this, Stadion used United of Omaha's Guaranteed Account. The Guaranteed Account guarantees principal amounts invested and provides a stated rate of return. The stated rate attaches to monies at the time of deposit and is adjusted periodically by United of Omaha.

**Answer:**  United admits that the Guaranteed Account is a capital-preservation product providing principal protection and a stated rate of return.  United further admits that under its group annuity contracts, an interest rate was declared at least once a month for all contributions directed into the Guaranteed Account received within the given calendar month.  United denies the remaining allegations in Paragraph 53.

54.     In order to pay returns and generate its own compensation, United of Omaha takes the monies deposited in the Guaranteed Account, transfers them to its general account, and invests the monies in a portfolio of fixed income investments, i.e. bonds. If these investments produce income that is higher than the stated returns, that difference is retained by United of Omaha.

**Answer:**  United admits that under group annuity contracts, contributions directed into the Guaranteed Account are held as part of United's general asset account.  United further admits

that it invests that money.  United also admits that it bears the investment risk and retains (or

pays) the difference between the credited interest rate and the return it earns (or loses) on the

funds invested in the Guaranteed Account.  United denies the remaining allegations in Paragraph

54.

55.     United of Omaha generally sets the stated return rate at a level that is 1.00% to
2.00% lower than the income it expects to earn by investing the underlying assets. United of
Omaha's profits on fixed income investments has fluctuated year-to-year, but has generally
conformed to this anticipated 1.00% to 2.00% spread. United of Omaha refers to its spread as
"implicit fees" of the Guaranteed Account.

**Answer:**  United denies the allegations in Paragraph 55.

56.     The Guaranteed Account was not a prudent investment option given its
unattractive risk-reward profile. There are many principal-guaranteed fixed income investments
available to retirement plans, and the proliferation of these products has created a marketplace of
insurance companies willing to guarantee a fixed income portfolio against loss of principal for an
annual fee. For the past decade, this fee has averaged between 0.08% and 0.30% of assets being
guaranteed, with current rates between 0.18% and 0.22% per year. T. Rowe Price, *Stable Value:
An Increasingly Attractive Principal Preservation Alternative*, June 2017, at 3, *available at*
https://www3.troweprice.com/usrps/content/dam/b2bdx/secure/Investments/Stable_Value_
Price_Perspective_GL_P6_FINAL.pdf (last visited Jan. 24, 2019). Yet United of Omaha was
charging participants ***five to ten times*** this amount within the Guaranteed Account, resulting in
net returns of roughly 0.98% per year over the past six years from year-end 2012 through year-
end 2018, which is around 0.90% less per year than the average annual returns earned during the
same period by principal-guaranteed peers of the Guaranteed Account, as measured by the
Hueler Index. The small reduction in risk offered by the Guaranteed Account was not justified by
the massive, inflated cost United of Omaha charged for it; a prudent, objective fiduciary
therefore would not have invested the core fixed income portion of participants' accounts in the
Guaranteed Account.

**Answer:**  United denies the allegations in Paragraph 56.

57.     Stadion's options for core fixed income investments included subaccounts that
invest in fixed income securities similar to the securities that United of Omaha purchases for its
own benefit using the monies invested in the Guaranteed Account. For example, United of
Omaha-administered plans generally offer a bond index fund and an actively-managed
diversified bond fund. These are low risk investments with successful long-term track records.
Returns on these investments have exceeded those of the Guaranteed Account by over 1.00% per
year (net of fees) during the relevant period.

**Answer:**  United denies the allegations in Paragraph 57.

58.     These other options generated more than double the returns as a result of lower fees. Although the underlying assets are similar and produced similar gross returns, the other options cost less than the Guaranteed Account's "implicit fees". In essence, participants paid United of Omaha five to ten times more for a principal guarantee than that guarantee was worth, unnecessarily slashing their returns in half even though the covered fixed income investments were already low-risk, and similar investments were readily available in each plan without that added cost.

**Answer:**  United denies the allegations in Paragraph 58.

59.     While Stadion's choice of the United of Omaha Guaranteed Account over other fixed income options was not justified on the merits, Stadion's distribution relationship with United of Omaha provides a plausible explanation for why that choice was made. United of Omaha and its affiliates issue an agreement to employers that allows them to add Stadion's service to their plan. This agreement requires employers make the United of Omaha Guaranteed Account available as an investment option in their plan "[i]n order for the Stadion services to be offered".

**Answer:**  United admits that employers that elect Stadion's managed account service in connection with a group annuity contract from United must include the Guaranteed Account as an investment option under the plan.  United further admits that some of these employers also select Stadion's managed account service.  United denies the remaining allegations in Paragraph 59.

60.     Although Stadion has complete discretion to determine which options to invest in on behalf of managed account participants, the terms of this agreement imply that United of Omaha *expects* Stadion to invest managed account assets in the Guaranteed Account, and would not have offered Stadion's services to plan sponsors absent an understanding that Stadion would allocate monies to the Guaranteed Account. This benefits United of Omaha and Stadion, as United of Omaha receives a steady flow of assets to generate "implicit fees" for itself, and Stadion maintains security with its marketing partner. However, it is not in the best interest of plan participants. Stadion has breached, and continues to breach, its fiduciary duties by investing managed account assets to secure favor with United of Omaha. A prudent, impartial fiduciary would have evaluated the fixed income options from the point of view of participants and selected alternatives to the Guaranteed Account that would have netted significantly higher returns without paying for a principal guarantee that was worth five to ten times less than United of Omaha was implicitly charging for it.

**Answer:**  United denies the allegations in Paragraph 60.

### *Stadion's Investment of the Flex Portion of Managed Accounts*

61.     As illustrated above (see *supra*, ¶ 36), Stadion's approach to managed accounts calls for between 25% and 40% percent of each participant's account to be remain flexible, without maintaining long-term positions in a specific asset class.

**Answer:**  On information and belief, United admits that each Stadion portfolio allocates a

percentage of assets to a "Flex" component that is moved out of (or into) markets and market

sectors as Stadion determines is appropriate.  United denies the remaining allegations in

Paragraph 61.

62.     To accomplish this, Stadion has used the Stadion-managed asset allocation subaccounts available in each plan. Through these subaccounts, Stadion has purchased and retained funds that track various market indexes. Stadion purports to evaluate market signals and move flex assets between funds to attempt to enhance investment returns.

**Answer:**  United admits that the Stadion managed account service invested in Stadion-

managed portfolios.  On information and belief, United further admits that the "Flex" component

of the Stadion portfolios is moved out of (or into) markets and market sectors as Stadion

determines is appropriate.  United denies the remaining allegations in Paragraph 62.

63.     Retaining these subaccounts was not in the best interest of participants. Stadion-managed subaccounts with at least five years of performance history have underperformed their stated benchmark indices by approximately 0.50% to 2.00% per year since their inception. Moreover, Stadion's subaccounts have consistently exhibited significantly negative levels of alpha, which means that the subaccounts' risk-adjusted performance was well below that of their benchmark indexes, further illustrating that Stadion's models and managers have demonstrated no discernable skill in strategically moving assets between markets to attempt to capitalize on market conditions.

**Answer:**  United denies the allegations in Paragraph 63.

64.     To make matters worse, Stadion's subaccounts have high product charges relative to other subaccounts (see *supra*, ¶¶ 47, 50–51). However, Stadion has no incentive to move managed account investments to other subaccounts with lower product charges, because this would reduce United of Omaha's revenue, threaten Stadion's ongoing marketing relationship with United of Omaha, and eliminate the indirect financial benefits Stadion accrued from the use of Stadion-affiliated subaccounts. *See supra*, ¶ 49.

**Answer:**  United denies the allegations in Paragraph 64.

23

65.     The imprudence of Stadion-managed investments is underscored by the behavior of unaffiliated fiduciaries. Stadion's investment products do not appear to have achieved any traction outside of plans administered by companies with whom Stadion has a marketing relationship. Based on a review of Form 5500 filings, it does not appear that any defined contribution plans not administered by a marketing partner of Stadion have included Stadion-managed investments in their investment menu. Further, within plans that have included Stadion-affiliated options, the Stadion-affiliated options are used almost exclusively by participants whose accounts are being managed by Stadion. Participants controlling their own investment decisions have by and large avoided the Stadion investments.

**Answer:**   United lacks the knowledge or information sufficient to form a belief as to the truth of the allegations concerning the Form 5500 filings reviewed, and therefore denies those allegations.  United denies the remaining allegations in Paragraph 65.

66.     Red flags have also been raised by independent analysts. Morningstar, a third-party provider of data and analysis regarding pooled investment vehicles, observed in late 2017:

> Of particular concern is [Stadion's] launch-and-liquidate history. Since 2003, the firm has launched eight funds under its banner. While one was merged away after 14 years, Stadion hasn't been as patient with others: Three were liquidated within two to five years and one overhauled its approach in less than three years…. [T]hat's a poor track record of product development, and fund investors in aggregate have experienced subpar performance overall.

Leo Acheson, Morningstar Analyst Report of Stadion Tactical Growth Fund, December 29, 2017.

**Answer:**   Paragraph 66 purports to characterize and quote a written document, which speaks for itself; therefore no response is required.  To the extent a response is required, United denies the characterization and the remaining allegations in Paragraph 66.

67.     Morningstar also has noted other disturbing trends. "With a private-equity partner since 2011, the firm seems to be emphasizing growth and profitability. Its sales team is about three times larger than its investment team. Portfolio manager bonuses are driven by firm profitability. … [F]und performance doesn't explicitly factor into compensation—a rare practice among well-regarded stewards. Portfolio managers have not invested meaningfully alongside fundholders." *Id.*

**Answer:** Paragraph 67 purports to characterize and quote a written document, which speaks for itself; therefore no response is required. To the extent a response is required, United denies the characterization and the remaining allegations in Paragraph 67.

68. Given Stadion's poor track record of risk-adjusted performance, the high product charges associated with its managed accounts, and other red flags, a prudent and loyal fiduciary would have replaced the Stadion-managed subaccounts. Stadion could have used the flex position in its managed account strategy to invest in other subaccounts managed by unaffiliated investment managers. There were numerous options available with strong absolute and risk-adjusted long-term track records, which could have further diversified participants' portfolios beyond core equity and core fixed income positions. Yet it does not appear that Stadion considered other options, as Stadion demonstrated an unyielding preference for its own subaccounts, despite their inferiority.

**Answer:** United lacks the knowledge or information sufficient to form a belief as to the truth of the allegations concerning what Stadion "considered," and therefore denies those allegations. United denies the remaining allegations in Paragraph 68.

## UNITED OF OMAHA'S KNOWING RECEIPT OF REVENUE IN RESULT OF STADION'S VIOLATIONS

69. For its part, United of Omaha received significant additional revenue as a result of Stadion's breaches of its fiduciary duties and prohibited transactions. These monies were transferred from participant accounts held in United of Omaha's client plans to United of Omaha at Stadion's direction on a periodic basis, as least as frequently as quarterly. The amount of each payment was higher as a result of Stadion's use of the Guaranteed Account and Stadion-managed subaccounts with higher product charges during each period.

**Answer:** United denies the allegations in Paragraph 69.

70. United of Omaha had knowledge of facts demonstrating that Stadion's direction of plan assets violated ERISA. Indeed, United of Omaha was complicit in compromising Stadion's loyalty and rendering each subsequent payment received by United of Omaha a prohibited transaction. United of Omaha agents used a form agreement that required employers to offer United of Omaha's Guaranteed Account to participants in order to offer Stadion's managed account service within their plan (see *supra*, ¶ 59). This implies an understanding between United of Omaha and Stadion that Stadion would direct managed account assets to United of Omaha's Guaranteed Account (instead of other fixed income options) on an ongoing basis, allowing United of Omaha to invest those monies and earn spread. Although Stadion had ultimate fiduciary discretion to determine whether to continue to direct managed account assets to the Guaranteed Account, United of Omaha's knowledge that Stadion exercised improper

25

preference for its Guaranteed Account over other options rendered its receipt of revenue in result of Stadion's violations improper (and illustrated that Stadion was conflicted generally).

      **Answer:** United denies the allegations in Paragraph 70.

      71.    United of Omaha also had sufficient knowledge that Stadion's direction of assets to higher cost subaccounts violated ERISA, rendering United of Omaha's receipt of higher product charges in connection with those transactions improper. United of Omaha distributed and maintained each participant agreement with Stadion. United of Omaha therefore understood that Stadion had agreed to invest each participant's account by choosing among the investments available in each plan, allocated as appropriate to best serve the participant. Yet United of Omaha was also aware that Stadion used only its own subaccounts, which paid higher product charges to United of Omaha than sometimes identical alternatives in each plan. Likewise, United of Omaha was aware of Stadion's dependence on United of Omaha and its desire to maintain favor with its host. In addition, United of Omaha was aware of Stadion's performance deficiencies relative to other subaccounts available to its client plans. Under these circumstances, United of Omaha knew that its high product charges assessed against these plan assets were not reasonable and were the result of Stadion's ongoing breaches of fiduciary duties and prohibited transactions.

      **Answer:** United denies the allegations in Paragraph 71.

      72.    Based on United of Omaha's knowledge of Stadion's violations of ERISA, United of Omaha is liable to disgorge all managed account assets transferred to it.

      **Answer:** United denies the allegations in Paragraph 72.

### PLAINTIFFS' LACK OF KNOWLEDGE OF DEFENDANTS' ERISA VIOLATIONS

      73.    Plaintiffs did not have knowledge of all material facts (including but not limited to Stadion's self-serving marketing arrangement with United of Omaha, Stadion's lack of historical success as an investment manager, Stadion's subversion of participants' interests to its own interests and United of Omaha's interests; the specific flaws in Stadion's managed account service; the manner in which other managed account services from other providers were prudently operated and administered; the structure of United of Omaha's Guaranteed Account relative to other investment options in the plan, and other facts) necessary to understand that Stadion breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until recently, shortly before this action was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to managed accounts, including Stadion's processes for designing its investment strategies, its processes for selecting, monitoring, and removing specific investments, and whether these processes provided preferential treatment to particular investments that were more profitable to United of Omaha and/or Stadion, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

**Answer:** United denies the allegations in Paragraph 73.

## CLASS ACTION ALLEGATIONS

74.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), 23(b)(1), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class of similarly situated persons (the "Class"):

> All participants and beneficiaries whose accounts were enrolled in Stadion's managed account service within a retirement plan administered by United of Omaha for any period of time after January 25, 2013.

**Answer:** United admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23 on behalf of the proposed class asserted in Paragraph 74. United denies that class certification is appropriate in this matter, and further denies the remaining allegations in Paragraph 74.

75.    Numerosity: The Class is so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time, Plaintiffs believe that there are thousands of Class members.

**Answer:** United admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23, but denies that class certification is appropriate in this matter. United lacks the knowledge or information sufficient to form a belief as to the truth of the allegations concerning what Plaintiffs "believe," and therefore denies those allegations. United denies the remaining allegations in Paragraph 75.

76.    Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were enrolled in Stadion's managed account service through retirement plans administered by United of Omaha, and have suffered injuries as a result.

**Answer:** United admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23, but denies that class certification is appropriate in this matter. United denies the remaining allegations in Paragraph 76.

77.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

**Answer:**  United admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23, but denies that class certification is appropriate in this matter.  United denies the remaining allegations in Paragraph 77.

78.    Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.    Whether Stadion owed fiduciary duties to participants and beneficiaries enrolled in its managed account service;

b.    Whether Stadion breached its fiduciary duties by directing participant assets into United of Omaha's Guaranteed Account for the core fixed income portion of participant portfolios;

c.    Whether Stadion breached its fiduciary duties by directing the core equity portion of participants' assets into Stadion-affiliated subaccounts;

d.    Whether Stadion breached its fiduciary duties by allocating assets to Stadion-affiliated accounts to implement the flex part of its managed account strategy;

e.    Whether the selection of investments that paid fees to United of Omaha, and the investment of participants' assets in United of Omaha's Guaranteed Account, constituted prohibited transactions;

f.    Whether the financial benefits received by Stadion through its investment of participant assets in Stadion-affiliated investments constituted prohibited transactions;

g.    Whether fees and profits received by United of Omaha in connection with Stadion's managed account service and related investments are subject to disgorgement under the circumstances described in this Complaint;

h.    The proper form of equitable and injunctive relief; and

i.    The proper form of monetary relief.

**Answer:**  United admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23, but denies that class certification is appropriate in this matter.  United denies the remaining allegations in Paragraph 78.

79.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable or injunctive relief by the Court will affect the interests of all Class members.

**Answer:**  United admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23, but denies that class certification is appropriate in this matter.  United denies the remaining allegations in Paragraph 79.

80.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The conduct described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**Answer:**  United admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23, but denies that class certification is appropriate in this matter.  United lacks the knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether putative class members "have an interest in" or what

Plaintiffs are "unaware of" and therefore denies those allegations.  United denies the remaining

allegations in Paragraph 80.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)-(B)

81.     As alleged above, Stadion owes fiduciary duties to participants in its managed
accounts service pursuant to 29 U.S.C. §§ 1002(21)(A)(i) and 1002(38)(C).

**Answer:**  Count I is not asserted against United and Paragraph 81 asserts legal

conclusions to which no response is required.  To the extent a response is required, United denies

the allegations in Paragraph 81.

82.     ERISA imposes strict fiduciary duties of prudence and loyalty upon Stadion in its
administration of managed accounts and in the selection and monitoring of investments. *See* 29
U.S.C. § 1104.

**Answer:** Count I is not asserted against United and Paragraph 82 asserts legal

conclusions to which no response is required. To the extent a response is required, United admits

that Paragraph 82 purports to characterize a statute, which speaks for itself.  United denies the

remaining allegations in Paragraph 82.

83.     As described above, Stadion engaged in imprudent and disloyal conduct with
respect to its managed account service, including the imprudent and disloyal allocation of Class
members' retirement account assets into United of Omaha- and Stadion-affiliated investment
options that resulted in higher fees and worse investment performance than unaffiliated options
that would have provided better performance at lower cost. Stadion acted in its own business
interests and the business interests of United of Omaha instead of the interests of plan
participants. In managing Class members' retirement accounts, Stadion sought to (and did)
enrich United of Omaha in order to preserve Stadion's marketing partnership with United of
Omaha, to the detriment of such Class members.

**Answer:**  Count I is not asserted against United and thus no response is required.  To the

extent a response is required, United denies the allegations in Paragraph 83.

84.     As a consequence of Stadion's breaches of fiduciary duty, Class members
suffered millions of dollars in losses due to excessive fees and investment underperformance.

Stadion is liable to make good to such Class members all losses suffered as a result of Stadion's fiduciary breaches, and to disgorge all profits resulting from its unlawful conduct, in addition to further equitable and injunctive relief.

 **Answer:** Count I is not asserted against United and thus no response is required.  To the extent a response is required, United denies the allegations in Paragraph 84.

**COUNT II**
**Knowingly Profiting from Violations of ERISA**
**29 U.S.C. § 1132(a)(3)**

 85. Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. The Supreme Court held in *Harris Trust*, see *supra*, ¶ 6, that a defendant may be liable under this section regardless of whether it is a fiduciary. In particular, a non-fiduciary party in interest who has received ill-gotten profits resulting from a violation of ERISA is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transactions or payments unlawful.

 **Answer:** Paragraph 85 asserts legal conclusions and purports to characterize a statute, which speaks for itself; therefore no response is required.  To the extent a response is required, United admits that Paragraph 85 quotes a phrase from 29 U.S.C. § 1132(a)(3) and purports to characterize a Supreme Court opinion, but otherwise denies the allegations in Paragraph 85.

 86. As described throughout the Complaint, United of Omaha earned profits from Stadion's imprudent, disloyal, and unreasonable allocation of participant assets to United of Omaha's Guaranteed Account. United of Omaha also earned higher profits as a result of Stadion's allocation of assets to Stadion-managed subaccounts than United of Omaha would have earned had Stadion allocated those monies to other investment options. All payments to United of Omaha made in connection with Stadion's managed accounts, or the proceeds of such payments, are determinable and traceable through the records kept by United of Omaha.

 **Answer:** United denies the allegations in Paragraph 86.

 87. United of Omaha had actual and constructive knowledge of the circumstances rendering Stadion's allocation of assets to the United of Omaha- and Stadion-affiliated investments unlawful. As administrator of these plans, United of Omaha had actual or constructive knowledge of the fees charged by Stadion's subaccounts compared to the fees charged by other investment options offered within United of Omaha-administered plans, and of the profits it was earning from monies invested in the Guaranteed Account compared with the fees charged by other fixed income investments offered to participants in United of Omaha-

administered plans. United of Omaha also had actual or constructive knowledge of Stadion's improper preference for the Guaranteed Account over other fixed income options due to its business agreement with Stadion, and also had knowledge of Stadion's conflicts of interest more generally. Accordingly, Plaintiffs and the Class are entitled to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of all profits earned by United of Omaha as a result of Stadion's fiduciary breaches and prohibited transactions during the class period, under principles of unjust enrichment and equitable restitution.

**Answer:** United denies the allegations in Paragraph 87.

## COUNT III
### Prohibited Transactions with a Party in Interest
### 29 U.S.C. § 1106(a)(1)

88.     As alleged throughout this Complaint, Stadion is a fiduciary with respect to the

assets that it manages for participants enrolled in Stadion's managed account program through

plans administered by United of Omaha.

**Answer:**  Count III is not asserted against United and thus no response is required.  To

the extent a response is required, United denies the allegations in Paragraph 88.

89.     As a provider of administrative and investment platform services to the same plans, United of Omaha is a party in interest with respect to such plans under 29 U.S.C. § 1002(14)(B).

**Answer:**  Count III is not asserted against United and Paragraph 89 asserts legal

conclusions and purports to characterize a statute, which speaks for itself; thus no response is

required.  To the extent a response is required, United denies the allegations in Paragraph 89.

90.     As described throughout the Complaint, Stadion caused plans to engage in transactions with United of Omaha by (1) investing participant assets in United of Omaha's Guaranteed Account; and (2) investing participant assets in other accounts that paid higher product charges to United of Omaha than other available investment options. These transactions occurred on a periodic basis throughout the relevant period, generally either monthly or quarterly depending upon the transaction type, as Stadion exercised its discretion to direct new plan monies and maintain existing plan monies in these investments, resulting in unreasonable and improper periodic transactions involving distribution of plan assets to United Omaha.

**Answer:** Count III is not asserted against United and thus no response is required. To the extent a response is required, United denies the allegations in Paragraph 90.

91. These transactions constituted a direct or indirect furnishing of services between the plans and a party in interest, a direct or indirect transfer of assets of the plan to a party in interest, a transfer of assets of the plan for use by a party in interest, and a transfer of the assets of a plan for the benefit of a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(C), (D). Stadion caused the plan to engage in these transactions through its control of the assets of participants enrolled in the managed account program, and the compensation paid to parties in interest pursuant to these transactions was unreasonable.

**Answer:** Count III is not asserted against United and Paragraph 91 asserts legal conclusions and purports to characterize a statute, which speaks for itself; thus no response is required. To the extent that a response is required, United denies the allegations in Paragraph 91.

92. As a direct and proximate result of these prohibited transactions, Class members directly or indirectly paid fees in connection with transactions that were prohibited under ERISA, and received investment returns below the returns they would have received had Stadion not caused the plan to engage in these prohibited transactions, resulting in significant losses to participants' accounts. Stadion is liable to make good to participants all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with its unlawful conduct. In addition, Class members are entitled to further equitable and injunctive relief on account of these prohibited transactions.

**Answer:** Count III is not asserted against United and thus no response is required. To the extent a response is required, United denies the allegations in Paragraph 92.

### COUNT IV
### Prohibited Transactions with a Fiduciary
### 29 U.S.C. § 1106(b)

93. As described throughout this Complaint, Stadion is a fiduciary with respect to the assets that it manages for participants enrolled in Stadion's managed account program through plans administered by United of Omaha.

**Answer:** Count IV is not asserted against United and thus no response is required. To the extent a response is required, United denies the allegations in Paragraph 93.

94. Acting in its fiduciary capacity as managed account provider, Stadion allocated participant assets to Stadion-affiliated investment options that provided direct and indirect

financial benefits to Stadion. These transactions occurred on an ongoing basis throughout the relevant period as Stadion exercised its discretion to direct new plan monies and maintain existing plan monies in these investments, resulting in unreasonable and improper benefits to Stadion. In so doing, Stadion dealt with plan assets in its own interest and for its own account, in violation of 29 U.S.C. § 1106(b)(1), and received consideration for its personal account in connection with transactions involving assets of the plan, in violation of 29 U.S.C. § 1106(b)(3).

**Answer:** Count IV is not asserted against United and thus no response is required.  To

the extent a response is required, United denies the allegations in Paragraph 94.

95.     As a direct and proximate result of these prohibited transactions, Class members directly or indirectly paid fees in connection with transactions that were prohibited under ERISA, and participants lost investment earnings that they would have obtained had Stadion not invested managed account assets in its own interests. Stadion is liable to make good to participants all losses suffered as a result of Stadion's prohibited transactions, and to disgorge all profits associated with its unlawful conduct. In addition, Class members are entitled to further equitable and injunctive relief on account of these prohibited transactions.

**Answer:** Count IV is not asserted against United and thus no response is required.  To

the extent a response is required, United denies the allegations in Paragraph 95.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, individually and as representatives of the Class, pray for relief as follows:

a.     A determination that this action may proceed as a class action under the Federal Rules of Civil Procedure;

b.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

c.     A declaration that Stadion has breached its fiduciary duties under ERISA;

d.     A declaration that Stadion violated 29 U.S.C. § 1106 by engaging in prohibited transactions;

e.     An order compelling Stadion to make good all losses incurred as a result of the breaches of fiduciary duty and prohibited transactions described above;

f.    An accounting for profits earned by Stadion in connection with the breaches of fiduciary duty and prohibited transactions described above and a subsequent order requiring Stadion to disgorge all such profits received;

g.    An accounting for profits earned by United of Omaha in connection with the breaches of fiduciary duty and prohibited transactions described above and a subsequent order requiring United of Omaha to disgorge all such profits received;

h.    An order enjoining Stadion from any further violations of ERISA;

i.    Other equitable relief to redress the practices described herein and to enforce the provisions of ERISA;

j.    An award of pre-judgment interest;

k.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

l.    An award of such other and further relief as the Court deems just and equitable.

**Answer:**  In response to the PRAYER FOR RELIEF section of the SAC, United admits that Plaintiffs seek the relief identified in this section, but denies that Plaintiffs or any putative class member are entitled to any type of remedy, relief, or damages whatsoever, including the relief requested in Plaintiffs' Prayer for Relief.  United denies the remaining allegations in this section and within these Paragraphs of the SAC.

## UNITED'S ADDITIONAL DEFENSES

Without assuming the burden of proof on any matters that would otherwise rest with Plaintiffs and the purported class members, and expressly denying any and all wrongdoing, United alleges the following defenses to the SAC:

### First Defense

Plaintiffs fail to state a claim upon which relief may be granted.

### Second Defense

Neither Stadion nor United is, or was, acting as a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1102(21)(A), with respect to the purported misconduct alleged by Plaintiff.

### Third Defense

The claims of Plaintiffs and/or other members of the putative class are barred in whole or in part by the applicable statutes of repose or limitations, including but not limited to ERISA § 413, 29 U.S.C. § 1113, and/or the doctrines of laches, waiver and/or estoppel.

### Fourth Defense

The claims of Plaintiffs and/or other members of the putative class are barred, in whole or in part, by their lack of standing.

### Fifth Defense

Any losses alleged by Plaintiffs were not caused by any alleged breach of fiduciary duty by Stadion or United, as set forth in ERISA § 409(a), 29 U.S.C. § 1109(a) and elsewhere, but resulted from economic causes and events not related to any alleged breaches of fiduciary duty, knowing participation in any breaches of fiduciary duty, or other misconduct of any kind by United, a non-fiduciary service provider.

### Sixth Defense

Any losses alleged by Plaintiffs were not caused by any fault, act, or omission by United, as set forth in ERISA § 409(a), 29 U.S.C. § 1109(a), and elsewhere, but were caused by circumstances, entities, or persons, including Plaintiff, for which United is not responsible and cannot be held liable.

**Seventh Defense**

To the extent Plaintiffs have stated a claim on which relief can be granted, Plaintiffs have proximately caused, contributed to, or failed to mitigate any and all losses claimed by them.

**Eighth Defense**

United received no benefit as a result of any of the transactions alleged in the SAC and engaged in no prohibited transactions within the meaning of ERISA § 406, 29 U.S.C. § 1106.

**Ninth Defense**

To the extent that Plaintiffs can establish any transactions prohibited by ERISA § 406, 29 U.S.C. § 1106, some or all of those claims are barred under the exemptions set forth in ERISA § 408, 29 U.S.C. § 1108, or elsewhere.

**Tenth Defense**

To the extent that Plaintiffs can establish any transactions prohibited by ERISA § 406, 29 U.S.C. § 1106, some or all of those claims are barred by the Prohibited Transaction Exemptions promulgated by the Department of Labor, or elsewhere.

**Eleventh Defense**

The investment products and services offered to Plaintiffs and the putative class members were substantively/objectively prudent.

**Twelfth Defense**

The fees associated with Stadion's managed account service, United's Guaranteed Account, and United's retirement plan administrative services were reasonable and properly disclosed.

### Thirteenth Defense

Plaintiffs are not entitled to certification of this action as a class action because they cannot satisfy the requirements of Federal Rule of Civil Procedure 23(a) or (b).

### Fourteenth Defense

The purported relief sought by Plaintiffs and/or the SAC is not recoverable under the applicable provisions of ERISA, including, but not limited to, because such relief does not constitute "appropriate equitable relief" under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

### Fifteenth Defense

United did not have actual or constructive knowledge of any breach of fiduciary duty or prohibited transaction, alleged or otherwise, by Stadion, a Palace Plan fiduciary, an American Title Plan fiduciary, or any other party or non-party.

### Sixteenth Defense

United did not improperly benefit from any transaction involving Stadion.

### Seventeenth Defense

United is relieved of any alleged liability based on plan participants' exercise of control over their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c), and/or because neither the Plaintiff, the putative class members, nor anyone else suffered a loss as a result of the actions or inactions of United under ERISA § 404(c).

### Eighteenth Defense

United presently has insufficient knowledge or information to form a belief as to whether there are additional defenses or affirmative defenses than those stated above, and it has not knowingly or intentionally waived any applicable defenses or affirmative defenses. United explicitly reserves the right to assert, and hereby give notice that it intends to rely upon, any

other defense that may become available or appear during discovery proceedings or otherwise and hereby reserves the right to amend its Answer to assert any such defense.

WHEREFORE, having answered Plaintiffs' SAC in its entirety, United prays that all of Plaintiffs' claims be dismissed with prejudice; that the Court enter judgment against Plaintiffs and/or any other putative class member and in favor of United on all causes of action; that all of United's costs and fees, including attorneys' fees, be awarded to United; and that the Court grant such other relief as the Court may deem just and proper.

Dated:  April 10, 2020

*/s/ Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld (pro hac vice)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5000
Facsimile: 215.963.5001
jeremy.blumenfeld@morganlewis.com

Christopher J. Boran (pro hac vice)
**MORGAN, LEWIS & BOCKIUS LLP**
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: 312.324.1000
Facsimile: 312.324.1001
christopher.boran@morganlewis.com

Abbey M. Glenn (pro hac vice)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: 202.739.3000
Facsimile: 202.739.3001
abbey.glenn@morganlewis.com

Mark F. Enenbach (15202)
James J. Frost (16560)
MCGRATH NORTH MULLIN & KRATZ, PC, LLO
First National Tower, Suite 3700

1601 Dodge Street
Omaha, NE 68102-1627
Telephone: 402-341-3070
Facsimile: 402-341-0216
menenbach@mcgrathnorth.com
jfrost@mcgrathnorth.com

*Counsel for Defendant United of Omaha Life Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2020, I electronically filed a true and correct copy of the foregoing document with the Clerk of Court using the CM/ECF system, which sent notification to all counsel of record.

<u>*s/ Jeremy P. Blumenfeld*</u>
Jeremy P. Blumenfeld
